FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 12, 2018

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

KEVIN OLDEN, M.D., )
) 
                    Plaintiff, )          No. 1:16-CV-3047-LRS
)
        v. )                      **ORDER RE MOTION**
)                                 **FOR SUMMARY**
)                                 **JUDGMENT**
YAKIMA HMA PHYSICIAN )
MANAGEMENT, LLC; YAKIMA, )
HMA, LLC, )
)
                    Defendants. )
_____ )

**BEFORE THE COURT** is Defendants' Motion For Summary Judgment (ECF No. 63). This motion was heard with oral argument on January 22, 2018. Matthew A. Brinegar, Esq., argued for Plaintiff. Jerome R. Aiken, Esq., argued for Defendants.

**I. BACKGROUND**

In this diversity case, Plaintiff contends his employment by Defendant Yakima Health Management Associates (HMA) Physician Management, LLC (Physician Management) was wrongfully terminated. His Second Amended Complaint (ECF No. 22) alleges causes of action against Physician Management for wrongful termination in violation of public policy, failure to pay wages in violation of RCW 49.52.050, breach of contract, breach of implied covenant of good faith and fair dealing, and intentional interference with business expectancy. Plaintiff also alleges a cause of action against Defendant Yakima Health

**ORDER RE MOTION
FOR SUMMARY JUDGMENT- 1**

Management Associates LLC (Yakima HMA), for intentional interference with contractual relations.

## II. UNDISPUTED FACTS

Defendants are Washington companies who formerly operated Yakima Regional Medical and Cardiac Center (YRMC).

Plaintiff, Kevin Olden, M.D., is a board-certified gastroenterologist and psychiatrist.

In late 2013, YRMC was owned and operated by Yakima HMA. YRMC contacted Plaintiff regarding employment in Yakima.

Plaintiff and Yakima HMA Physician Management entered into a Physician Employment Agreement dated April 29, 2014.[1] The agreement was signed by Plaintiff on May 6, 2014, and by Veronica Knudson on behalf of Physician Management on May 8, 2014.

At the time of entering into the agreement, Plaintiff was not licensed to practice medicine in the State of Washington.

During Plaintiff's employment, Jamon Rivera was the director of all of the medical clinics.

During Plaintiff's employment, Veronica Knudson was the Chief Executive Officer (CEO) of YRMC and Plaintiff's ultimate supervisor.

The Physician Employment Agreement was later amended to indicate Plaintiff's commencement date as September 2, 2014. On that date, Plaintiff had a temporary conditional medical license in the State of Washington, but he did not

///

_____

[1] Although Physician Management was the only "Employer," for the sake of convenience, the court refers to "Defendants" throughout this order in addressing Plaintiff's claims.

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    2**

yet have an active license. As of that date, Plaintiff was granted temporary privileges at YRMC.

Plaintiff was paid a commencement bonus of $25,000 on September 19, 2014.

On October 3, 2014, Plaintiff obtained an unrestricted Washington license to practice medicine.

Plaintiff was 66 years old during his employment by Physician Management.

Plaintiff did not work on Wednesday, November 26, 2014, nor did he work on Friday, November 28, 2014.

On Monday, December 15, 2014, Plaintiff was in Florida attending an Eluxadoline[2] Advisory Board meeting. He received compensation for attending that meeting.

YRMC had a call schedule that was available in the emergency department of the hospital. The schedule contained a list of on-call physicians who could be contacted by emergency room personnel to respond to emergency situations. Plaintiff was on-call December 2, 17, 18 and 31, 2014.

Plaintiff declined to attend a meeting scheduled for December 18, 2014 to discuss gastrointestinal service issues.

Plaintiff declined to attend a meeting scheduled with Veronica Knudson for December 19, 2014.

Jamon Rivera sent an e-mail to Plaintiff on December 23, 2014, discussing dissatisfaction with Plaintiff's employment performance.

Plaintiff met with Knudson on December 31, 2014. At Plaintiff's request, fellow physicians, Drs. Cundiff and Good, were in attendance. Plaintiff appeared
///

_____

[2] A medication taken for irritable bowel syndrome.

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    3**

briefly at the meeting and then left, stating he would not discuss anything without his lawyers being present.

In a letter to Plaintiff dated January 15, 2015, Knudson discussed her dissatisfaction with Plaintiff's conduct, including what she asserted was the Plaintiff taking leave when he was not authorized to do so.

On January 16, 2015, Plaintiff's employment was terminated. The reasons for his termination were summarized in a letter to Plaintiff from Knudson, dated January 16, 2015. Plaintiff was terminated for cause. The letter cited Paragraph 5.5.8 of the Employment Agreement and alleged conduct by Plaintiff "such as unilaterally scheduling yourself for time off, avoiding in patient duty, walking out of our meeting on the 31st . . . ."

After his termination, Plaintiff sought employment as a *locum tenens*[3] physician at Western Arizona Regional Medical Center (WARMC) in Bullhead City, Arizona. Plaintiff's application was not processed on the asserted basis that he did not meet the criteria for employment at WARMC.

## III. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975). Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. A dispute about a material

---

[3] A temporary position.

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT- 4**

fact is "genuine" if the evidence is such that a reasonable fact-finder could find in favor of the non-moving party. *Id.*

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

When considering a motion for summary judgment, the court does not weigh the evidence or assess credibility; instead "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-23.

**IV. DISCUSSION**

The Physician Employment Agreement states Plaintiff could be terminated with or without cause.[4]

Paragraph 5.4 provides that "[t]his Agreement may be terminated by either party for no cause upon ninety (90) days written notice to the other party."

Paragraph 5.5 provides that "[t]his Agreement may be terminated immediately by Employer, without penalty or prejudice to Employer, upon

///

---

[4] The term of the agreement was 36 months.

**ORDER RE MOTION
FOR SUMMARY JUDGMENT- 5**

occurrence of any of the following events," one of which is set forth in Paragraph 5.5.8:

> Employer's determination, in Employer's sole discretion, that Physician's continued employment would pose an unreasonable risk of harm to patients or others or would adversely affect the confidence of the public in the services provided by the Employer or Hospital, or Employer's determination that Physician has engaged in subordinate or unprofessional conduct, or Employer's determination that Physician has engaged in any conduct that is unethical, unprofessional, fraudulent, unlawful, or adverse to the interest, reputation or business of Employer or Hospital[.]

## A. Breach of Contract/Implied Covenant of Good Faith and Fair Dealing

Defendants contend that because they had "sole discretion" to terminate Plaintiff for cause, Plaintiff's breach of contract cause of action fails as a matter of law. Defendants acknowledge, however, that their interpretation of what constitutes "unreasonable risk of harm to patients or others or would adversely affect the confidence of the public," or "subordinate or unprofessional conduct," or "conduct that is unethical, unprofessional, fraudulent, unlawful, or adverse to the interest, reputation or business of Employer or Hospital," must be reasonable. Indeed, one of the cases cited by Defendants, *Bearden v. Humana Health Plan, Inc.*, 1992 WL 245604 (N.D. Ill. Sept. 23,1992) at *4, held that while a "sole discretion" clause made it irrelevant whether the employer had cause to fire an employer, it was still necessary that the employer make a for cause determination and that said determination not be in bad faith. Furthermore, Defendants acknowledge that under Washington law, every contract is subject to an implied duty of good faith and fair dealing. *Rekhter v. Dept. of Social. & Health Services*, 180 Wn.2d 102, 112, 323 P.3d 1036 (2014). One of the causes of action pled by Plaintiff is breach of implied covenant of good faith and fair dealing.

Accordingly, what must be determined is whether there was in fact adequate "cause" to terminate the Plaintiff.

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    6**

**1. Vacation**

The Cover Sheet of the Physician Employment Agreement contains all of the information specific to Plaintiff. (Ex. 3 to ECF No. 65 at p. 0184). It is followed by the "Standard Terms And Conditions" of the agreement which include Paragraphs 5.4 and 5.5.8, discussed above.

With regard to "Vacation Days," the Cover Sheet states "Four (4) Weeks," without a reference to "Employer Physician Benefits Summary."[5] With regard to "Sick Days" and "Holidays," the Cover Sheet states "Per Employer's Physician Benefits Summary." Defendants maintain that Plaintiff's four weeks of vacation was also subject to the 2014 Physician Benefits Summary, whereas Plaintiff says it was not and that the same was specifically negotiated out of the Employment Agreement.

The "2014 Benefits Summary For Benefit Eligible Employed Physicians of Central Washington Medical Group" (Ex. 19 to ECF No. 65) addresses "Physician Time Off" (PTO) for "Continuing Medical Education (CME)," "Holidays," "Vacation" and "Sick Leave." With regard to "Vacation," it provides that "[u]nless your employer cover sheet provides a different schedule, your vacation hours are earned each pay period based on your length of service" such that up to 120 hours (three weeks) can be earned for each year during Years 1-4 and 160 hours (four weeks) can be earned for each year during Years 5-9. It further provides that "[v]acation hours may be used after completion of 90 days of continuous employment" and that "vacation time must be scheduled and approved in advance and approval may be withheld if the vacation would interfere with scheduled patient care or would create a financial hardship on the practice." (*Id*. at p. 0290).

///

---

[5] Four weeks is equivalent to 160 hours.

Defendants contend Plaintiff violated the foregoing provisions by taking vacation in September, October and November 2014, prior to working 90 continuous days, and by not obtaining approval to take time off from December 21 through December 31, 2014. Plaintiff contends that because his vacation time was not subject to the Physician Benefits Summary, he did not have to work 90 days continuously to take vacation and he did not have to accrue vacation time.

According to Plaintiff, the first iteration of the employment contract stated he would receive three weeks of paid vacation subject to the Physician Benefits Summary and that he objected and the words "Physician Benefits Summary" were stricken and he received four weeks vacation. Plaintiff cites e-mail correspondence between him and Jamon Rivera and between him and Lori Stephenson who is/was Director of Physician Opportunities for YRMC and Central Washington Medical Group. (Ex. 2 to ECF No. 74). This correspondence, while indicating Plaintiff clearly wanted four weeks of vacation, does not indicate he actually and specifically objected to having the Physician Benefits Summary otherwise apply to his vacation time.

In her April 15, 2014 e-mail to Plaintiff, on which Rivera was copied, Stephenson states:

> In regard to the vacation[,] I doubt we can get 5 weeks at this point. As you can see[,] they require we start new physicians out at 3 weeks. I hope you can work with the 4 weeks, plus the 7 holidays. If it's a deal breaker for you[,] I can ask.

It appears Stephenson is referring to the Physician Benefits Summary which provides that new physicians get three weeks (120 hours) of vacation.

Later on April 15, Plaintiff sent an e-mail to Jamon Rivera, stating as follows:

> I infer from your email I am being offered 4 weeks (terrific) but my contract states "vacation per the policy outlined in the benefits document." So please clarify. I suspect we have agreed on 4 but this will clearly need to be stated in the contract.

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    8**

On April 17, an e-mail presumably to Plaintiff from Justin Ballinger, a Regional Vice President of The Medicus Firm (a physician recruitment firm), states that "Lori is getting an amendment for the 4 weeks vacation" and "[s]he will send it as soon as it is approved."

This e-mail chain does not conclusively establish that the Physician Benefits Summary (Summary) was negotiated out of the Employment Agreement as the Summary specifically pertained to "Vacation."  Indeed, it reasonably suggests the opposite and that the parties were negotiating vacation with reference to the Summary and within the framework of the Summary.

The Defendants note there is deposition testimony from Plaintiff in which he acknowledged the Physician Benefits Summary provided for "Vacation" to be prorated for someone employed for less than a year.   Plaintiff further acknowledged he needed to get approval to take vacation time.  (ECF No. 91 at p. 065 and p. 067).  The court cannot conclude, however, that Plaintiff's testimony amounts to a concession by him that the Summary applied to his vacation time specifically, as opposed to him merely offering his opinion about what he thought the Summary meant in regard to vacation time in general.

Defendants also assert that interpreting the Employment Agreement in a fashion that makes the Summary not apply to Plaintiff's vacation time is unreasonable in that "Plaintiff could have taken four weeks off the first day of work, and he could have taken off at any time despite the needs of his employer." (ECF No. 96 at p. 11).  This is not necessarily so, however, as Plaintiff acknowledges he too was subject to an implied covenant of good faith and fair dealing which prevented him from taking time off whenever he wanted despite the needs of his employer.  Defendants contend Plaintiff's interpretation would mean Plaintiff is not entitled to any of the other benefits addressed in the Summary, including medical, dental and vision insurance coverage, disability coverage, life insurance and Continuing Medical Education. Plaintiff, however, does not argue

**ORDER RE MOTION FOR SUMMARY JUDGMENT-    9**

the Summary has no application to the Employment Agreement; he argues only that it has no application to his vacation time.

The "context" rule is the framework for interpreting written contract language which involves determining the intent of the contracting parties by viewing the contract as a whole, including (1) subject matter and objective of the contract, (2) all circumstances surrounding its formation, (3) the subsequent acts and conduct of the parties, (4) the reasonableness of the respective interpretations advocated by the parties, (5) the statements made by the parties in preliminary negotiations, and (6) usage of trade and course of dealings. All contracts are interpreted under the context rule and this is true regardless of whether or not the court determines that the terms of the contract are ambiguous. *Berg v. Hudesman*, 115 Wn.2d 667, 668, 801 P.2d 222 (1990). The application of the context rule leads the court to discover the intent of the parties based on their real meeting of the minds, as opposed to insufficient written expression of their intent. Context may not be used to contradict, modify or add to the written terms of the agreement, nor may it be used for importing into the writing an intention not expressed therein. *Tjart v. Smith Barney, Inc.*, 107 Wn. App. 885, 895-96, 28 P.3d 823 (2001).

"If only one reasonable meaning can be ascribed to the agreement when viewed in context, that meaning necessarily reflects the parties' intent; if two or more meanings are reasonable, a question of fact is presented." *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 943, 974 P.2d 1261 (1999). "Interpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence or (2) only one reasonable inference can be drawn from the extrinsic evidence." *Scott Galvanizing, Inc. v. Northwest EnviroServices, Inc.*, 120 Wn. 2d 573, 582, 844 P.2d 428 (1993).

The court concludes a question of fact is presented for resolution by a jury as there are two reasonable meanings to the parties' agreement about vacation

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    10**

time.  A jury could reasonably find that Plaintiff's vacation time was not subject to any conditions of the Summary (e.g., no vacation for 90 days; approval necessary to take vacation thereafter; accrual of vacation time per pay period).[6]  A jury could also reasonably find Plaintiff's four weeks of vacation was subject to the conditions of the Summary based on the aforementioned negotiations about vacation time which suggests the Summary provided the framework for those negotiations, and based on the Plaintiff thereafter seeking approval for all of the leave he did take (subsequent conduct).  While it is reasonable to interpret the absence of any reference to the Summary on the Cover Sheet in regard to vacation time as meaning the Summary did not apply, an equally reasonable interpretation is there was no specific reference to the Summary because it would have made no sense to say "Four Weeks (4) weeks" "Per Employer's Physician Benefits Summary" because the Summary specified only three (3) weeks for a beginning physician like Plaintiff.  It was reasonable to leave out a specific reference to the Summary while at the same time intending that the conditions of the Summary pertaining to vacation would apply to the four weeks vacation given to Plaintiff.

Whether or not the Summary applied to Plaintiff's vacation time, the next question is whether Plaintiff had approval for all of the days he took leave.  It appears that what led to Plaintiff's termination in January 2015 was the time he

---

[6]  In addition to there being no specific reference to the Summary regarding vacation time, in two "Employee Time Off Request[s]" from Plaintiff dated January 8, 2015, his PTO (Personal Time Off Balance) is reflected as 160 hours (4 weeks) .  (Ex. 2 to ECF No. 94, Declaration of Stephanie Baldoz).  According to Baldoz, this simply indicated that Plaintiff, per his Employment Agreement, had 160 hours of PTO available to him in 2015, but he did not have that much time available to him immediately because he would have to earn vacation time as the year progressed.   A jury will consider if this is a reasonable explanation.

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    11**

took off in December 2014, and specifically the time after December 19, 2014. While Defendants assert that Plaintiff worked only five of the 23 working days in December 2014, there is no discussion of Plaintiff being absent on any specific dates prior to December 19, other than him being in Florida on Sunday, December 14, and Monday, December 15, for an Eluxadoline Advisory Board Meeting.

In an email to Plaintiff dated December 19, Jamon Rivera informed Plaintiff as follows:

> I was told late yesterday that you are planning on leaving town this afternoon and will be out all next week, which was not approved, because of the amount of time you have been employed by us **and the other vacation requests you made**. Stephanie [Baldoz] says she communicated this to you on November 24[th]. I wanted to touch base with you to follow-up that if indeed you are planning on leaving[,] it has not been approved.

(Ex. 42 to ECF No. 65)(emphasis added). This email indicates Plaintiff made "other vacation requests" prior to December 2014.

In a follow-up letter to Plaintiff dated December 23, 2014, Rivera wrote:

> With the holidays coming and no paid vacation left, you decided on your own to stop seeing patients. After Friday December 19, you scheduled no patients for the rest of the year. You did this **without approval of the practice manager** and without pay, as you already used up all of your paid vacation time.

(Ex. 43 to ECF No. 65)(emphasis added). This letter suggests Rivera recognized Baldoz, as the "practice manager," was the one to give approval for leave requests. In deposition testimony, Baldoz acknowledged she was the practice manager to whom Rivera referred in his letter. (ECF No. 74-17 at p. 35).

Plaintiff says his clinic was shutdown during the last two weeks of December 2014 ("[n]o one was going to be present to staff the clinic") and he was forced to take unpaid leave. According to Plaintiff, he requested paid vacation, but Rivera denied it and so he took unpaid leave which he says was approved by Baldoz. Plaintiff says Baldoz approved all of the time he took off while employed

///

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    12**

by Defendants and signed his approval slips. (Olden Declaration at Paragraph 11, ECF No. 75; ECF No. 74-5 at p. 93 and p. 100).

In her declaration, Baldoz says she did not have authority to grant any physician's request for vacation days, paid time off, or time off without pay, and that only her supervisor, Jamon Rivera, could do that. (ECF No. 94 at Paragraph 3). Baldoz also claims the clinic was not closed the last two weeks of December as she was working, and at least one physician assistant was working. (ECF No. 94 at Paragraph 4).

There are genuine issues of material fact whether Plaintiff was approved to take leave when he did and as such, whether Defendants breached the Employment Agreement.[7] If Plaintiff did not have approval to take leave for days prior to December 2014, that is a defense which goes to the amount of damages recoverable by Plaintiff if the Employment Agreement was breached. This is because Defendants claim they did not discover those other absences until after Plaintiff's termination.

The "after-acquired evidence" doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later "discovers" evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct. *Lodis v. Corbis Holdings, Inc.*, 192 Wn. App. 30, 60, 366 P.3d 1246 (2015), citing *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070-71 (9th Cir. 2004). An employer can avoid back pay and other remedies by coming

---

[7] Subsumed within this issue of material fact is whether Defendants unreasonably withheld approval for paid vacation during the last two weeks of December 2014, and whether the clinic was closed during those last two weeks, as asserted by Plaintiff. If the jury finds the Summary did not apply to Plaintiff's vacation time, that may strengthen Plaintiff's argument that he had paid vacation time available to him for the last two weeks of December 2014.

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-  13**

forward with after-acquired evidence of an employee's misconduct, but only if it can prove by a preponderance of the evidence "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id*., quoting *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360-63, 115 S.Ct. 879 (1995). If the employer proves the same, back pay is calculated from the date of the wrongful discharge to the date the new information was discovered. *Id*. See Washington Pattern Jury Instructions 330.81.01 and .02. The after-acquired evidence doctrine serves as a limitation on damages, but is not a defense against breach of contract. The after-acquired doctrine presents a question of fact that must be resolved by a jury. *Palmquist v. Shinseki*, 729 F.Supp.2d 425, 432 (D. Me. 2010).

### 2. Outside Employment

Paragraph 3.1 of the Employment Agreement states "[p]hysician shall practice on a full-time basis, exclusively for Employer within the scope of this Agreement, in accordance with all the terms and conditions of this Agreement, and Physician shall not provide the Services on behalf or for the benefit of any other person or entity."

Plaintiff was in Florida on Sunday, December 14, and Monday, December 15, for an Eluxadoline Advisory Board Meeting. Plaintiff acknowledges this was not a CME course. He says it was "in part, for educational purposes," and he was compensated for his attendance by the Advisory Board. Defendants assert Plaintiff did not receive permission to attend this meeting and that it was a violation of Paragraph 3.1 prohibiting outside employment. For his part, Plaintiff says he did not know he was expected to get permission to attend this meeting "as he had been attending these types of meetings for decades without having to get
///

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    14**

any permission from his employers." (Olden Declaration at Paragraph 20, ECF No. 75).

Defendants claim that in addition to the foregoing, Plaintiff saw patients who were not patients of the clinic at which he was employed and that he performed professional medical-legal expert work. The Defendants do not, however, cite any evidence, including Plaintiff's deposition testimony (Ex. 5 to ECF No. 74 at pp. 79-81; 194), which conclusively establishes that Plaintiff was doing these things during the short period of time he was employed by Defendants (see for example Ex. 67 to ECF No. 65).

Plaintiff's alleged engagement in outside employment was not specifically cited by Knudson as a basis for termination of Plaintiff's employment. Therefore, if anything, outside employment is an "after-acquired" reason justifying termination which serves to limit damages, but is not a defense to breach of contract. Plaintiff's unapproved December 2014 trip to Florida, however, seemingly would also fall under the umbrella of alleged unauthorized PTO (Personal Time Off). While Knudson did not specifically refer to the Florida trip in her letters to Plaintiff dated January 15 and 16, 2015, she said that Plaintiff was "not at liberty to take time off whenever you choose" and that conduct "such as unilaterally scheduling yourself for time off" was not acceptable and justified his termination. (Exs. 46 and 48 to ECF No. 65).

Defendants contend Plaintiff had a scientific manuscript, unrelated to his work for Defendants, transcribed by Defendants at their expense. (Ex. 27 to ECF No. 65). Plaintiff asserts the manuscript "was connected to my work for Defendants because it involved my area of practice and would serve to promote my services." (ECF No. 75 at Paragraph 20). He adds that he did not know this would be an issue because "[m]ost employers encourage this kind of work because it enhances the prestige of the practice." (*Id*.).

///

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    15**

There is a genuine issue of material fact whether Plaintiff engaged in outside employment in violation of the Employment Agreement. Even if there was a violation, there is an issue of material fact whether Defendants would have terminated his employment had they known of it at the time.

### 3. Accuracy of Application(s)

The Employment Agreement includes an "Applicant Certification, Agreement And Release" which Plaintiff signed. It says:

> The information in my application, resume, and disclosed in the interview process is true, correct and complete. I understand that any misrepresentation, falsification, omission or deception of material facts may cause my application to be rejected or any employment terminated.

(Ex. 3 to ECF No. 65 at p. 0201).[8]

During his April 1, 2017 deposition, Plaintiff acknowledged several errors in his application materials. (ECF No. 63 at pp. 15-17). In Paragraph 18 of his Declaration (ECF No. 75), Plaintiff offers an explanation of what happened:

> My wife fills out my credentialing documents. She wrote down the wrong dates that I was not working due to cardiac surgery. I signed the application and take responsibility for it, but I never intended to mislead anyone about the dates and would have no reason to do so. My wife also wrote down that I was relocating to Yakima. I had no reason to misrepresent that I was relocating to Yakima as opposed to anywhere else. I disclosed my entire working history in my credentialing documents, including the few "gaps" occasioned by cardiac surgery or a sabbatical. I was not asked to explain the gaps.

Defendants suggest in general that Plaintiff's "self-serving" declaration varies his deposition testimony, but with regard to Paragraph 18 specifically, the court finds nothing therein that varies from what Plaintiff testified to at his

///

---

[8] At page 15 of their opening brief (ECF No. 63), Defendants quote different language, but their citations do not reveal that language.

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    16**

deposition. What is new is that Plaintiff offers an explanation for the inaccuracies which he was not given an opportunity to do during the deposition.

The aforementioned inaccuracies are something not discovered by Defendants until Plaintiff's April 1, 2017 deposition, over two years after his termination. Pursuant to the after-acquired evidence doctrine, as discussed *supra*, Defendants have the burden of proving they would have terminated Plaintiff for the inaccuracies. These inaccuracies are not a defense to breach of contract, but are a defense to the amount of damages for which Defendants may be liable. There is a genuine issue of material fact whether these inaccuracies were of such severity that Defendants would have terminated Plaintiff's employment because of them. A jury will decide that question.

### 4. Failure To Take Call

On October 29, 2014, the five physicians of Yakima Gastroenterology Associates (YGA) declared they would cease to take call for GI patients at YRMC and resigned their active hospital privileges there. After a meeting with YRMC administration on November 18, Plaintiff says he agreed to take over YGA's duties and be on-call Monday through Friday, 8 a.m. to 4 p.m., blocking out the morning for consults. (Olden Declaration., ECF No. 75 at Paragraph 4). According to Plaintiff, he agreed to try this schedule out for two weeks, but after those two weeks, realized it was not feasible. Plaintiff says the block time was wasted because random consults would come in, but he would spend a lot of time waiting around. (*Id*. at Paragraph 5). Plaintiff says Rivera and Knudson did not properly notify staff regarding his new call schedule and, as such, he started to get calls around the clock. He says he was also concerned the administration did not have a backup or call-coverage plan in case he needed to handle another emergency or an elective procedure. (*Id*. at Paragraph 6).

///

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    17**

On December 1, 2014, Plaintiff says he asked the hospital to e-mail him a copy of the Medical Staff Bylaws and the hospital's "On-Call Policy." (*Id.* at Paragraph 7; Ex. 37 to ECF No. 65). After receipt of those materials, Plaintiff says he informed Rivera and Knudson that he did not have to take call because of his age and informed them their call plan was in violation of the law. (*Id.* at Paragraph 8). Although Plaintiff told Rivera and Knudson he would no longer take call from 8 a.m. to 4 p.m. Monday through Friday, he says he still took call four times a month in accordance with his prior arrangements with YGA and YRMC. According to Plaintiff, he was not obligated to do this, but did so to "benefit the community and help grow my practice in Yakima." (*Id.* at Paragraph 9). Plaintiff says that until he declined to take "extra call," he had no problem getting his vacation requests approved and it was only after this that his requests were denied. (*Id.* at Paragraph 10). He also contends his job was never threatened until he advised Rivera and Knudson that their call schedule was unworkable and not in compliance with the law. (*Id.* at Paragraph 8).

Article 8.1.1 of the Medical Staff Bylaws[9] sets forth the qualifications of Active Medical Staff. One of those (B.) is as follows:

> Maintain a call coverage residence within 15 miles of the hospital or close enough to allow the Active Staff member to be physically present within 30 minutes of an emergency request and provide for the continuous care of his/her own patients in the hospital or have other appropriate mutually acceptable arrangements with another Medical Staff Member with admitting privileges. \* *Members of the Active Staff who are at least 62 years of age **and who have served on the Active Staff for at least the immediate preceding five years*** may

---

[9] It is apparently undisputed that this was the version of the bylaws in effect during the relevant period of time, September through December 2014. It appears these bylaws were adopted in 2012, whereas the "On Call Policy-ER Call" was created in June 2011 by a "Bylaws Committee." (Ex. No. 37 to ECF No. 65, p. 0393; ECF No. 74-4 at p. 0337).

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    18**

> *request removal from emergency call and other rotational*
> *obligations. The department chair will recommend to the M.E.C.*
> [Medical Executive Committee] *whether to grant such a*
> *request based on need and the effect on others who serve*
> *on the call roster for that specialty. The M.E.C.'s*
> *recommendation will be subject to final action by the*
> *Board.*

(ECF No. 74-3 at p. 0320)(*Italics* in original; **Bold** added).

Article 8.1.3 D. of the Medical Staff Bylaws states:

> Active Medical Staff Members shall be required to provide
> emergency room coverage as stated in the On-Call Policy
> approved by the Medical Executive Committee, and Governing
> Body. This call policy must remain in compliance with
> relevant laws and regulations (i.e., EMTALA) . . . .

(ECF No. 74-3 at p. 0321).

The "On-Call Policy-ER Call" provides:

> Members of the Medical Staff older than 62 years of age
> will not be required to take call but do have the option of
> remaining on the call roster. In the event of unusual
> situations when the on-call physician in that specialty is
> occupied with a concurrent emergency, then the requesting
> physician, after talking to the on-call physician, may need
> to call the Chairperson of the Department or his/her designee
> or the on-call physician to arrange for coverage. If the
> Department Chair is unavailable, then the on-call physician
> may contact the President of the Medical Staff or designee.

(ECF No. 74-4 at p. 0337).[10]

Because Plaintiff acknowledges he opted to remain on the call roster, the court questions the need to determine if, by virtue of the "On-Call Policy-ER Call," he would have been entitled to request removal from the call roster due to his age, notwithstanding that he had not served on the Active Medical Staff for at least the immediate preceding five years as specified in the bylaws. The "On-Call Policy-ER Call" does not say anything about serving five years on the Active

---

[10] Schedule 1.3 A. 6. to the Employment Agreement obliges a physician to comply "with the rules, regulations, policies, procedures and bylaws of Employer and/or Hospital . . . ." (Ex. 3 to ECF No. 65 at p. 0196).

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    19**

Medical Staff before having the option to request removal from the call roster. Plaintiff contends the "On-Call Policy" governs over the bylaws and because he was over 62, he was not contractually obligated to take any call at all.

If it is necessary to decide whether it is the bylaws or the "On-Call Policy-ER Call" which governs, the court concludes as a matter of law it is the bylaws by virtue of Article 1.4 of the same which states: "In case of conflict between the Policies and procedures of the Medical Staff and the Bylaws, the Bylaws shall prevail." (ECF No. 74-4 at p. 0312). Furthermore, the bylaws were enacted in 2012, after the "On-Call Policy," which was enacted in 2011. Contrary to Plaintiff's assertion, the bylaws do not specifically state the "On-Call Policy" "governs" over the bylaws. Article 8.1.3 B. merely states Active Medical Staff Members are required to provide emergency room coverage "as stated in the On-Call Policy."[11]

The jury will not be allowed to find Plaintiff was not obligated to take call because he was older than 62 years of age and therefore, that Defendants breached the Employment Agreement by requiring him to take call. Defendants were within their contractual rights to ask Plaintiff to take call because he had not been employed five years, notwithstanding his age. And, as noted, Plaintiff willingly agreed to take at least some call. Defendants were not, however, allowed to terminate Plaintiff's employment for protesting call coverage in violation of the EMTALA, if that is in fact what they did. This issue is discussed *infra* in regard to Plaintiff's wrongful termination claim.

---

[11] When viewed in context, only one reasonable meaning can be ascribed to the bylaws in relation to the on-call policy: that an Active Medical staff member could not opt out of call unless he had been employed the immediate preceding five years- and therefore, no question of fact is presented for resolution by a jury. *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 943, 974 P.2d 1261 (1999).

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    20**

**B. Wrongful Termination In Violation Of Public Policy**

Employees may not be discharged for reasons that contravene public policy. *Gardner v. Loomis Armored Inc.*, 128 Wn. 2d 931, 935, 913 P.2d 377 (1996). Washington courts permit public policy tort actions in four circumstances: (1) when the employer fires an employee for refusing to commit an illegal act; (2) when the employer fires an employee for performing a public duty or obligation, such as serving on jury duty; (3) when an employer fires an employee for exercising a legal right or privilege, such as filing a worker's compensation claim, and (4) when an employer fires an employee in retaliation for reporting employer misconduct. *Id*. at 936. There are four elements to this cause of action: (1) the existence of a clear public policy (clarity element); (2) discouraging the conduct in which the employee engaged would jeopardize the public policy (jeopardy element); (3) the public-policy-linked conduct caused the dismissal (causation element); and (4) the employer must not be able to offer an overriding justification for the dismissal (the absence of justification element). *Id*. at 941.

According to Plaintiff, the policy at issue is embodied in the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd *et seq*. Regulations promulgated pursuant to this Act require hospitals to have an on-call list of physicians who are . . . available to provide treatment necessary after the initial examination to stabilize individuals with emergency medical conditions," 42 C.F.R. § 489.20(r)(2), and have "written policies and procedures in place . . . [t]o respond to situations in which a particular specialty is not available or the on-call physician cannot respond because of circumstances beyond the physician's control," 42 C.F.R. § 489.24(j)(1). Plaintiff alleges Defendants did not have a written policy to provide emergency services, nor did they provide him with backup coverage.

Citing 42 U.S.C. § 1395dd(i), "Whistleblower protections," Defendants contend Plaintiff does not qualify as a whistleblower. This provision states:

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    21**

A participating hospital may not penalize or take adverse action against a qualified medical person . . . or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

Defendants contend this is not the situation with Plaintiff as he "only voiced concerns over alleged deficiencies in Defendants' on-call policies." This argument fails to realize that Plaintiff is not asserting a claim under the federal EMTALA whistleblower provision that prohibits retaliation against those who refuse to authorize "patient dumping" or report the same. Rather, he is asserting a claim under Washington common law for wrongful termination in violation of a public policy which he says is set forth in EMTALA: that a hospital have sufficient on-call physicians available to handle emergencies.

"In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." *Thompson v. St. Regis Paper Co.*, 102 Wn. 2d 219, 232, 685 P.2d 1081 (1984). A federal statute can be a source of public policy. *Id*. at 234. The Washington Supreme Court has "expressed a willingness to hold that a broad public policy articulated in a statute could extend beyond the reach of the statutory remedies created by the Legislature so long as the policy is clear." *Sedlacek v. Hillis*, 145 Wn. 2d 379, 388, 36 P.3d 1014 (2001). Whether or not a clear mandate of public policy exists is a question of law. *Id*. The court agrees with Plaintiff that the clear mandate of public policy in EMTALA is the screening and stabilizing of patients and this policy is jeopardized when hospitals do not have sufficient on-call physicians, including backups, available to handle emergencies.

Defendants contend "Plaintiff's whistleblowing claim fails as he has provided no evidence that he told any person about his concerns during his employment." Plaintiff is not making a whistleblowing claim under EMTALA,

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    22**

however, and therefore, he is not bound by any particular reporting requirements under EMTALA and/or the cases which have interpreted EMTALA.  Furthermore, Plaintiff has offered sufficient evidence to create a genuine issue of material fact that he did communicate his concerns to hospital administration (Rivera and Knudson).  (Olden Declaration, ECF No. 75 at Paragraphs 8 and 13).  Plaintiff's declaration is sufficient to raise an issue of material fact so long as it does not vary his deposition testimony.  His declaration does not clearly vary his deposition testimony.  That Plaintiff does not provide a specific date or dates for when he allegedly communicated his concerns to hospital administration, and  apparently lacks any documentation concerning those alleged communications, are matters for the jury's consideration in weighing Plaintiff's credibility.

Defendants contend their request that Plaintiff see "inpatients during normal business hours" does not implicate EMTALA.  In support of this contention, they cite deposition testimony from Dr. Robert A. Bitterman, an expert witness for the Plaintiff.  According to Defendants, Bitterman's deposition testimony establishes that for the purpose of EMTALA, "on-call" means to see or consult about a patient in the emergency room during an emergency condition, which is distinct from Plaintiff's obligation under the Employment Agreement to see "inpatients" and his verbal agreement on November 18, 2014, to see inpatients Monday through Friday, 8 a.m. to 4 p.m..  (ECF No. 91 at pp. 31, 41-43).  Again citing Dr. Bitterman's deposition testimony, Defendants say the only thing that implicated EMTALA was the "call" which Plaintiff agreed to be on four times a month.  (*Id*. at pp. 42-44).

In rendering his opinions, Dr. Bitterman was asked to review Knudson's January 15, 2015 letter to Plaintiff in which she stated:

> Your Employment Agreement with Central Washington Medical Group is to provide care for the patients that we serve both inpatient and outpatient.  **Your refusal to provide care for inpatients, other than the 4 days a month that you are on call is not in compliance with your Agreement.**

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    23**

(Ex. 46 to ECF No. 65)(emphasis added).[12] Knudson's January 16 termination letter to Plaintiff was consistent with this in referring to Plaintiff "avoiding in patient duty" as an indication he did not "wish to abide by [his] full-time commitment under the current agreement." (Ex. 48 to ECF No. 65). Defendants contend "Plaintiff just did not want to see inpatients, something he agreed to and then later refused to do in violation of his contract."

The court concludes there is a genuine issue of material fact whether the arrangement Plaintiff says he agreed to try out on a temporary basis- being available to see inpatients from 8 a.m. to 4 p.m., Monday through Friday- amounted to him being on-call during that time so as to implicate EMTALA. While Dr. Bitterman appeared to testify that being required to see only inpatients did not implicate EMTALA, he also stated that it was implicated if Plaintiff was on-call during that time. (ECF No. 91 at pp. 41-42). Plaintiff asserts he was on-call and there is evidence which suggests he needed to make himself available for emergencies in the emergency room at the hospital during that time. At her deposition, Knudson maintained that being on-call requires a 30 minute response, but the court is not aware of Dr. Bitterman concurring with that standard and furthermore, Knudson's deposition testimony arguably suggests Plaintiff's obligation could have easily morphed into an on-call obligation:

> Q: And was this additional time when he was supposed to respond to emergencies, was that also considered part of being on call?
>
> A: It was not. Being on call requires a 30-minute response. When he was in the clinic if he didn't have patients scheduled and there was a patient in the emergency department, he could - - we requested that he go over and see that patient.

_____

[12] It is undisputed that Plaintiff was "on-call" December 2, 17, 18 and 31, 2014.

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    24**

**It did not require a 30-minute response at that point in time.**

(Knudson Dep., ECF No. 65-2 at p. 44)(Emphasis added).

Knudson further testified that she called the November 18, 2014 meeting with Plaintiff because "we were having issues about emergency patients that came into the ED and not having the GI service available." (ECF No. 111-4 at p. 33).[13] She acknowledged this meeting happened "in the wake of Yakima GI Associates no longer taking call." (*Id*.). Knudson testified she approved of the letter to Plaintiff from Jamon Rivera, dated December 23, 2014, in which Rivera took issue with Plaintiff being gone the last two weeks of December, reminding Plaintiff that "GI medical conditions can be quite serious," that "[i]t is critical to patient care that GI services be available on an immediate basis," and that "[t]his is why we contracted with you for a full-time commitment to GI patient care." (ECF No. 111-4 at p. 88; Ex. 43 to ECF No. 65). According to Knudson, if patients were emergent and Plaintiff was not available or on-call, the plan was send to those patients to the other hospital, Yakima Valley Memorial Hospital. (ECF No. 111-4 at p. 89).[14]

A jury will decide if Plaintiff was on-call from 8 a.m. to 4 p.m., Monday

_____

[13] In a December 29, 2015 e-mail to Plaintiff, Knudson described the November 18, 2014 meeting as "agree[ing] to a plan whereby your schedule would blocked M-F at 0800 for you to be able to see in house consults and a block in the afternoon for you to do any necessary procedures." (Ex. 45 to ECF No. 65).

[14] In oral argument, Defendants' counsel asserted Dr. Bitterman testified at his deposition that diversion to another hospital is an appropriate plan. The court is not aware of Defendants citing to such testimony in their written materials. In any event, if that is what Dr. Bitterman testified to, Defendants can present it to the jury for consideration.

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    25**

through Friday, pursuant to the arrangement he reached with Defendants at the November 18, 2014 meeting, and whether that arrangement constituted a violation of the policy of EMTALA in that Plaintiff did not have a backup physician. This is the jeopardy element of a public policy tort claim. A jury will also decide the causation element of Plaintiff's public policy tort claim- was he terminated because he refused to abide by an arrangement violating the policy embodied in EMTALA?[15] A jury will decide if, as Defendants claim, Plaintiff was merely looking for an excuse to not abide by his contractual obligations. And a jury will also decide if Defendants had an overriding justification for terminating Plaintiff's employment.

## C. Intentional Interference With Business Expectancy

Intentional interference with business expectancy is a tort. A plaintiff must prove five elements: 1) that a valid contractual relationship or business expectancy existed; 2) that the defendant knew of that relationship or expectancy; 3) that the defendant intentionally interfered by inducing or causing a breach or termination of that relationship or expectancy; 4) that defendant interfered with an improper purpose or by improper means; and 5) that damage to the plaintiff resulted from the interference. *Shooting Park Ass'n v. City of Sequim*, 158 Wn. 2d 342, 351, 144 P.3d 276 (2006).

_____

[15] With regard to the jeopardy and causation elements, Defendants presumably will present testimony at trial from Knudson that hospital administration believed the hospital's on-call policy was wholly appropriate and not in violation of EMTALA. (Knudson Declaration, ECF No. 92 at Paragraphs 6 and 7). Dr. Bitterman's deposition testimony suggests he did not agree with Knudson that the hospital's on-call policy satisfactorily addressed all EMTALA concerns. (ECF No. 121-5 at pp. 80-85).

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    26**

Plaintiff alleges he had a business expectancy for *locums* work at Western Arizona Regional Medical Center (WARMC) in Bullhead City, Arizona, and that Defendants intentionally and in bad faith interfered with this expectancy by falsely claiming Plaintiff was an insubordinate employee. Defendants maintain Plaintiff has produced no evidence that Defendants intentionally and in bad faith interfered with Plaintiff's asserted business expectancy.

At her September 12, 2017 deposition, Knudson acknowledged she spoke to the CEO of WARMC about the Plaintiff. The WARMC CEO asked her why Plaintiff had left employment at YRMC and Knudson says she "told him that we had a difference in interpretation of the contract." (ECF No. 74-9 at p. 94). She says she told him there was "a difference of opinion of . . . what the contract obligations were," and that while he may have asked what that meant, she did not "go any further." (*Id.* at pp. 94-95).[16]

Considering there is a genuine issue of material fact whether Plaintiff was wrongfully terminated by Defendants, a reasonable inference arises that Knudson may have shared more with the WARMC CEO than she testified to (e.g., she expressly stated or impliedly indicated Plaintiff was insubordinate) and this was the reason why Plaintiff was not hired for the job with WARMC. If Plaintiff was not insubordinate, it would have been improper for Knudson to indicate such to the WARMC CEO. A legitimate question is why the WARMC CEO felt the need to communicate with Knudson if, as contended by WARMC, Plaintiff's application was not processed because he could not perform a certain type of

---

[16] Knudson's recollection was that Plaintiff did not put his employment at YRMC on his Curriculum Vitae (CV) which he gave to the *locums* company (ECF No. 74-9 at p. 94), but acknowledged she and the WARMC CEO "work together." (*Id*. at 95). In his deposition testimony, Plaintiff indicated that WARMC and YRMC are owned by the same corporate entity. (ECF No. 74-5 at p. 58).

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    27**

surgical procedure and did not have professional liability insurance. (Ex. 63 to ECF No. 65).

At this juncture, there is a genuine issue of material fact whether Defendants intentionally interfered with a business expectancy Plaintiff claims to have had with WARMC.

### D. Damages

#### 1. Limitation on Damages

Defendants contend Plaintiff is limited to 90 days of damages in accord with Section 5.4 of the Employment Agreement which allows either party to terminate the agreement without cause upon 90 days notice. Defendants do not cite any Washington law for this proposition and Plaintiff does not cite any Washington law to counter it. Washington law appears, however, to be in accord with what the Defendants contend, at least insofar as concerns recovery of contract damages. According to *Mason v. Mortgage A., Inc.*, 114 Wn. 2d 842, 849, 792 P.2d 142 (1990):

> Contract damages are ordinarily based on the injured party's expectation interest and are intended to give that party the benefit of the bargain by awarding him or her a sum of money that will, to the extent possible, put the injured party in as good a position as that party would have been in had the contract been performed.

As Plaintiff notes, however, the law cited by Defendants (*Reiver v. Murdoch & Walsh, P.A.*, 625 F.Supp. 998, 1010 (D. Del. 1985)) pertains only to contract damages. It does not pertain to consequential damages (whatever those may be in the instant case) and it does not pertain to damages recoverable in tort for wrongful discharge in violation of public policy and intentional interference with a contract or a business expectancy. Consequential and tort damages are not subject to a 90 days limitation.

///

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-    28**

Defendants contend that if Plaintiff's damages are not limited to the 90 days period, the court should alternatively hold as a matter of law that Plaintiff is not entitled to any wage-related damages after April 1, 2017. Plaintiff acknowledges the after-acquired evidence doctrine limits his remedies to when his alleged wrongdoing was discovered by Defendants (April 1, 2017) and says he is not seeking any damages beyond that date.

### 2. Mitigation of Damages

Defendants contend Plaintiff admitted he failed to mitigate his damages after his termination by failing to diligently look for permanent employment and therefore, the court should find as a matter of law that he so failed and instruct the jury accordingly. The deposition testimony of Plaintiff cited by Defendants (ECF No. 74-5 at p. 72) is arguably not an admission of failure to mitigate damages. Plaintiff testified that after he was terminated, he sought temporary positions. According to his declaration (ECF No. 75 at Paragraph 16), after he was terminated by Defendants, he returned to Arizona and in February 2015, applied for a *locum tenens* position because he "decided to take a break from taking on a permanent position but . . . believed [he] could up [his] schedule and make approximately the same amount of salary with temporary positions until [he] was ready again to place [his] trust in another employer."

Only reasonable efforts at mitigation are required. The duty to mitigate is not absolute. Reasonable minds could differ regarding the reasonableness of Plaintiff's mitigation efforts and therefore, mitigation is a question for the jury. Defendants presumably will present to the jury the evidence (ECF No. 120 at pp. 6-8) which they assert shows Plaintiff failed to use reasonable efforts to mitigate his damages.

///
///

**ORDER RE MOTION FOR SUMMARY JUDGMENT- 29**

### 3. Liquidated Damages/Recovery of Commencement Bonus

Defendants have been allowed to file an Amended Answer (ECF No. 104) pleading counterclaims for recovery of liquidated damages pursuant to Paragraph 12.1 of the Employment Agreement for Plaintiff's alleged breaches of the same, and for recovery of the Commencement Bonus paid to Plaintiff pursuant to Schedule 1.5 E.

Recovery of liquidated damages depends on whether Plaintiff breached his Employment Agreement such that Defendants were justified in terminating his employment. Whether he breached the Employment Agreement is an issue of fact for the jury.

Defendants seemingly contend that recovery of the Commencement Bonus does not necessarily depend on whether Plaintiff breached the Employment Agreement and Plaintiff is obligated to return it merely by virtue of his employment being terminated. According to Schedule 1.5 E.:

> In the event the Agreement is terminated for any reason other than the Physician's death or total disability, or in the event that Physician fails to discharge any of the duties set forth herein, Physician agrees to and shall, without demand, immediately pay . . . to Employer the un-amortized amount of the total Commencement Bonus Amount paid to Physician pursuant to the Agreement.

If the jury determines that Plaintiff failed to discharge any of his duties (breached the Employment Agreement), the Defendants are entitled to reimbursement of the Commencement Bonus. If the jury determines otherwise (that Plaintiff did not breach the Employment Agreement), the court will determine through post-trial motion practice whether Defendants are nevertheless entitled to reimbursement of the Commencement Bonus.

### 4. Moving and Relocation Expenses

The court is not aware of any evidence that Plaintiff was paid any Moving and Relocation expenses pursuant to Schedule 1.5 B. According to that provision,

**ORDER RE MOTION**
**FOR SUMMARY JUDGMENT-     30**

Physician Management, as the "Employer," agreed to reimburse Plaintiff "certain reasonable expenses incurred by [him] for the professional move of normal household items . . . in connection with [his] relocation to [Yakima]." Citing deposition testimony from Jamon Rivera, (Ex. 5 to ECF No. 91 at p. 96), Defendants assert Plaintiff never hired a professional mover and instead purchased some used furniture in Zillah which he had a hospital employee move to an apartment the Plaintiff rented in Yakima. Plaintiff "partially" disputes this, citing his deposition testimony in which he stated it was his intention to move to Yakima, to purchase a home or condo, and move his wife and child there from Arizona after his child completed her last year of middle school. (ECF No. 74-5 at pp. 111-12).

If Plaintiff is claiming he is entitled to recover moving and relocation expenses as part of his damages, the court fails to see how he is entitled to recover the same considering there is no indication he hired a professional mover. Schedule 1.5 B. clearly contemplates a professional move as indicated by the sentence quoted above and an additional sentence that "[u]pon Physician's relocation to the Community, Employer shall pay such expenses in an amount up to the Relocation Expense Amount . . . directly to the Physician **or on Physician's behalf to Physician's professional moving company**." (Emphasis added).

The court finds as a matter of law that Plaintiff is not entitled to Moving and Relocation Expenses as an element of damages.

## V.  CONCLUSION

Defendants' Motion For Summary Judgment (ECF No. 63) is **GRANTED** in limited part as follows: 1) as a matter of law, Plaintiff was not allowed to opt out of call because of his age; and 2) as a matter of law, Plaintiff is not entitled to the recovery of Moving and Relocation Expenses as an element of damages.

///

Otherwise, the Motion For Summary Judgment is **DENIED** for the reasons set forth herein.[17]

      **IT IS SO ORDERED**.  The District Executive is directed to enter this order and forward copies to counsel.

      **DATED** this   12th   of February, 2018.


                        ***s/Lonny R. Suko***
                        LONNY R. SUKO
              Senior United States District Judge

---

[17] All evidentiary objections asserted by the parties on summary judgment are reserved and may be reasserted as necessary in anticipation of trial.

**ORDER RE MOTION
FOR SUMMARY JUDGMENT-    32**